## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ROBERT BUNDY**,

        Plaintiff,

    vs.                            No.    **CIV 05-122 MCA/RLP**

**CHAVES COUNTY BOARD**
**OF COMMISSIONERS**,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the *Defendant's Motion for Summary Judgment* [Doc. 29] filed on July 14, 2005. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants Defendant's motion and dismisses Count I of Plaintiff's *Complaint* with prejudice for the reasons set forth below. The state-law claims asserted in Counts II through IV of Plaintiff's *Complaint* are dismissed without prejudice for lack of jurisdiction under 28 U.S.C. § 1367(c)(3).

## I.    BACKGROUND

On February 4, 2005, Plaintiff Robert Bundy filed this civil action against his former employer, Defendant Chaves County Board of County Commissioners. Count I of Plaintiff's *Complaint* alleges that Defendant violated Title I of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12111 to 12117, by terminating his employment after failing to engage in the interactive process necessary to reasonably accommodate his disability. [Doc. 1.]

Counts II through IV of Plaintiff's *Complaint* assert various state-law claims under the New Mexico Human Rights Act (NMHRA), N.M. Stat. Ann. §§ 28-1-1 to 28-1-15 (Michie 2004), and New Mexico's common law of contracts.

On January 9, 2006, Defendant moved for summary judgment on all of Plaintiff's claims. [Doc. 31.]  The undisputed facts and evidence of record relating to Defendant's summary-judgment motion can be summarized as follows.

Defendant hired Plaintiff to work as an Adult Detention Officer in the Chaves County Detention Center on June 2, 2002.  On or about October 9, 2003, Plaintiff was involved in a motor-vehicle accident that resulted in the amputation of his left arm above the elbow. Upon learning of the accident the following day, Defendant's Human Resource Specialist, Sheila Nunez, sent a letter to Plaintiff at his home address to inform him of Defendant's procedures under the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 to 2654.  [Ex. A to Doc. 30.]  At the request of Plaintiff's family, Ms. Nunez also invoked Defendant's leave donation policy and asked other employees if they would like to donate leave to Plaintiff.  [Ex. E to Doc. 30; Nunez Dep. at 76-77; Shannon Dep. at 13.]

Under these leave procedures, Defendant initially granted Plaintiff 12 weeks of FMLA leave upon receiving a certification from Plaintiff's doctor, Fred J. Hensal, M.D., indicating that Plaintiff was unable to perform work of any kind and needed to be absent from work. [Ex. D to Doc. 30; Riggs Dep. at 18; Bundy Dep. at 149.]  These procedures also specified that Plaintiff was required to present a "release to return to work" certificate from his health-care provider before resuming work.  [Ex. A to Doc. 30; Nunez Dep. at 21-23; Riggs Dep.

-2-

at 18-19.]  Dr. Hensal's FMLA certification did not provide such a release nor did it indicate the probable duration of Plaintiff's absence from work.  [Ex. D to Doc 30.]

The packet of materials that Ms. Nunez sent to Plaintiff or his doctor in October 2003 for the FMLA certification noted above also contained a copy of the job description for Plaintiff's position as an Adult Detention Officer.  Plaintiff later acknowledged in his deposition testimony that his doctor had access to this job description and discussed it with him at some point during his treatment.  [Bundy Dep. at 150-52.]  When Dr. Hensal was deposed, he could not remember specific discussions with Plaintiff on this topic, but he believed that he had at least spoken with Plaintiff about work in general terms--stating he had "some severe reservations about him being a prison guard."  [Hensal Dep. at 16.]

Plaintiff was released from the hospital on October 20, 2003, and by that time he learned that he was on FMLA leave.  [Bundy Dep., Ex. B to Doc. 30, at 125, 149]  Later that month, he came to Ms. Nunez's office to fill out forms for short-term disability insurance.  At the meeting with Ms. Nunez, Plaintiff asked her about the possibility of giving him advertisements of job openings that came up within the county, and he expressed an interest in the job of dispatcher.  [Bundy Dep., Ex. B to Doc. 30, at 129, 142-44.]

In his subsequent deposition testimony, Plaintiff answered that he had "no idea" whether he was actually "capable of performing the essential functions of a dispatcher position."  [Bundy Dep. at 171.]  After Defendant quoted and attached this deposition testimony with the brief filed in support of *Defendant's Motion for Summary Judgment* [Doc. 30], Plaintiff changed his answer in an undated affidavit stating that, after reviewing a

"Position Specifications Summary" for the dispatcher position, he now believes he could perform the duties of that job.  [Bundy Aff. ¶¶ 14-16.]  There is also evidence that, in the mid-1990s, the County Sheriff employed a dispatcher who had a paralyzed arm.  [Jennings Dep. at 18.]

At his deposition, Plaintiff's recollection of the October 2003 meeting was that Ms. Nunez told him she would forward job advertisements per his request.  [Bundy Dep. at 143.] Ms. Nunez, on the other hand, recalls telling Plaintiff that she would notify him of "in-house" job openings that were not publicly advertised, and that he would have access to all other openings because they were available on a "job posting board" or through the Internet and the newspaper.  At her deposition, Ms. Nunez explained that she could not guarantee that she would personally notify Plaintiff of each publicly-advertised job opening because "[i]t was only me servicing 260 employees.  I don't do that because somebody would slip through the cracks.  It's not a safe process."  [Nunez Dep., Ex. 3 to Doc. 33, at 30-32.]

Defendant's responses to interrogatories indicate that a dispatcher position in the County Sheriff's office became vacant on September 26, 2003, and that the person hired to fill that position began work on January 1, 2004.  The next vacancy in this position did not occur until March 1, 2004.  The interrogatory responses further explained that the vacancy occurring on September 26, 2003, was filled from a pool of applicants who responded to a request for applications posted from May 26, 2003, through June 1, 2003, and that such vacancies are sometimes filled from the existing pool without seeking additional applications.  [Ex. 10 to Doc. 33.]  Other than his expression of interest in becoming a

-4-

dispatcher, Plaintiff has not identified any vacancies in county government for which he was interested or qualified. [Ex. N to Doc. 30.]

In her deposition testimony, Ms. Nunez claims that she responded to Plaintiff's expression of interest in the dispatcher position by stating: "We will take it one step at a time and see what your doctor says." [Nunez Dep. at 33.] According to Ms. Nunez, she could not act on Plaintiff's expression of interest in the dispatcher position alone because she "didn't have a release to return to work [in] any job." [Nunez Dep. at 37.] Her understanding was that disabled employees requesting a transfer "would have to provide me something from the doctor that says why they can no longer perform the job they are in and what those restrictions or accommodations need to be, before I can consider anything. I can't move forward or look at any position for them until I get something that gives me a step to move to." [Nunez Dep. at 32-33.] Ms. Nunez and other employees further explained that due to privacy regulations, they cannot contact an employee's health-care provider on their own initiative without first obtaining a release from the employee. [Nunez Dep. at 15, 59; Jackson Dep. at 24; Apodaca Dep. at 8-9]

Mr. Bundy, however, denies that Ms. Nunez made any reference to, or request for, a release or statement from Plaintiff's doctor at the October 2003 meeting. [Bundy Aff. ¶ 12.] Mr. Bundy also denies telling Ms. Nunez anything about not being interested in returning to work at the detention center during that meeting [Bundy Dep. at 142-43], although he now acknowledges that he did not ask his doctor to provide a release regarding

his return to work because he believed that his doctor would not release him to his old position, and because he felt that he should not return to that position.  [Bundy Aff. ¶ 20.]

After his initial meeting with Ms. Nunez, Plaintiff made a social visit to the Chaves County Detention Center during the latter part of October 2003 to talk with other employees, including Acting Detention Administrator Esther Apodaca, who had been asking about how he was doing.  In response to the question of when he would be returning to work, Plaintiff told the other employees that he "had no idea" and that it was up to his doctor.  [Bundy Dep., Ex. B to Doc. 30, at 146-47.]  He also may have expressed to Ms. Apodaca his interest in no longer working at the detention center and instead pursuing a position as a dispatcher. [Apodaca Dep. at 15-17.]

Plaintiff's next contact with Defendant concerning his employment status was when he received another letter from Ms. Nunez advising him that his 12 weeks of FMLA leave expired.  [Bundy Dep. at 149.]  Ms. Nunez's letter requested that Plaintiff provide a "prognosis for return to work from your physician no later than January 16, 2004, so that we may evaluate this situation further."  [Ex. I to Doc. 30.]  Plaintiff sought and obtained an extension of his FMLA leave during January 2004 in order to gain additional time to respond to this request.  [Bundy Dep. at 155-57.]  Ms. Nunez claims that when speaking with Plaintiff about this extension of his leave on January 20, 2004, she again told him that she needed "a prognosis for return to work."  [Nunez Dep. at 60-61.]

After no such response from Plaintiff or his health-care provider was forthcoming,

County Manager Stanton Riggs sent Plaintiff a letter dated January 23, 2004, regarding a

"Pre-termination Hearing for Non-Disciplinary Reasons." This letter advised Plaintiff that:

> At this time, you have been unable to provide us with a medical release from
> your doctor allowing you to return to work, nor have you been able to provide
> us with a time table as to when you will be able to return to regular duty. As
> such, I am scheduling a pre-termination hearing for Wednesday, January 28,
> 2004 . . . . At that time, you will be allowed to present any documentation
> from your doctor regarding your return to work. If you have questions, please
> contact me.

[Ex. J to Doc. 30.]

Plaintiff appeared at the pre-termination hearing on January 28, 2004. He did not,

however, provide any documentation from his doctor. In particular, Defendant received no

prognosis for Plaintiff's return to work at any position within the county government, no

medical advice concerning what accommodations would be necessary for his return, and no

explanation of why he could not return to work in some capacity at that time. Instead,

Plaintiff simply repeated his expression of interest in becoming a dispatcher. [Bundy Dep.

at 158-59, 162-63; Riggs Dep. at 19-21, 44-45, 53-54.]

In response, Mr. Riggs informed Plaintiff that the dispatcher position was under the

hiring authority of the County Sheriff, "[b]ut no matter what, you have got to have a return-

to-work from your doctor." [Riggs Dep. at 19-21; Bundy Dep. at 162-63.] At their

depositions, Mr. Riggs and the County Sheriff, Pat Jennings, further explained that the

County Manager does not have hiring authority for positions such as dispatcher which fall

within the Sheriff's Department because the County Sheriff is an elected official separate

from the County Commissioners under whom the County Manager serves. [Riggs Dep. at 9, 14-15; Jennings Dep. at 7, 14.] This deposition testimony is consistent with the information provided in Defendant's responses to interrogatories. [Ex. 10 to Doc. 33.]

At the pre-termination hearing, Mr. Riggs also asked Plaintiff clarifying questions to try to ascertain whether Plaintiff had any "timetable" for returning to work. According to Mr. Riggs, Plaintiff responded to these questions by saying: "My doctor is really not communicating with me. He is not telling me a whole lot. I don't have any idea." [Riggs Dep. at 53-54.]

When Dr. Hensal was deposed after this civil action was filed, he told a different story. According to Dr. Hensal, it was Plaintiff who "didn't talk much at all" and "was just not very communicative." [Hensal Dep. at 12.] At his deposition, Dr. Hensal also opined that Plaintiff was unhappy and depressed during the course of his treatment, which was understandable in light of the trauma he had recently experienced. [Hensal Dep. at 56.]

When Dr. Hensal was questioned about the dispatcher position at his deposition, he testified that: "As far as I can recall, this is the first time I have heard anything with him being a dispatcher." [Hensal Dep. at 53.] Dr. Hensal also testified at his deposition that he could not opine with reasonable medical certainty about Plaintiff's qualifications for the position of dispatcher. [Hensal Dep. at 53-55.] And, in any event, there is no evidence that Defendant ever received an opinion from Dr. Hensal or any other health-care provider about Plaintiff's present or future suitability for work as a detention officer, dispatcher, or any other county job, except for the initial FMLA certification indicating that Plaintiff was

-8-

unable to perform work of any kind and needed to be absent from work for an indefinite period of time.  [Hensal Dep. at 26-29; Ex. D to Doc. 30.]   There is also no evidence that Dr. Hensal or any other health-care provider ever informed Defendant of any medical opinions about Plaintiff's mental state--or its effect on Plaintiff's ability to communicate--at the time that Defendant's requests for a prognosis were pending.

After the pretermination hearing, Mr. Riggs wrote a letter to Plaintiff terminating his employment effective February 2, 2004.  [Riggs Dep. at 92.]  The termination letter states, in relevant part, that:

> As you will recall, your Family Medical Leave ended January 13, 2004. The pre-termination hearing was conducted to determine whether you could return to work at the Detention Center.  You stated that your doctor would not be releasing you to work any time soon.  We are now almost three weeks beyond the twelve weeks allowed by FMLA.   As such, the County cannot keep your job open for an extended period of time.  Therefore, you shall be terminated effective February 2, 2004.  You have been an outstanding employee these past one and one half years and we look forward to possibly working with you again in the future.

[Ex. O to Doc. 30.]   The letter also advised Plaintiff of his right to appeal the County Manager's decision in accordance with the Chaves County Personnel Policy.

The record is silent with respect to any such appeal.  Plaintiff did, however, file charges with the Equal Employment Opportunity Commission (EEOC), resulting in a determination letter in Plaintiff's favor dated September 15, 2004.  [Ex. 13 to Doc. 33.]  For purposes of the pending summary-judgment motion, Defendant does not raise any issues as to whether Plaintiff timely exhausted his administrative remedies before filing this civil action.

-9-

II.   **ANALYSIS**

A.   **Standard of Review**

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law.  A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).  An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim.  See id. at 248.  Judgment is appropriate "as a matter of law" if the non-moving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex Corp., 477 U.S. at 324; Wright-Simmons v. City of Okla. City, 155 F.3d 1264, 1268 (10th Cir. 1998).  "To survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.'"  Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir.1991)).  Thus, "[h]earsay

-10-

testimony cannot be considered" in ruling on a summary-judgment motion.  Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995) (applying this rule to inadmissible hearsay testimony in depositions).  In addition, the Court may disregard an affidavit that contradicts the affiant's own sworn deposition testimony if the Court finds that such an affidavit constitutes an attempt to create a "sham fact issue."  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1223 n.2 (10th Cir. 2000) (citing Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986)).

In this case, the parties have submitted exhibits and deposition testimony that contain hearsay.  In reviewing these materials to determine whether Defendant is entitled to summary judgment, the Court does not consider statements that affiants or deponents attribute to others for the purpose of proving the truth of the matters asserted therein, except for admissions by a party opponent (or agent thereof) which the affiant or deponent witnessed.  See Fed. R. Evid. 801(d)(2); Wright-Simmons, 155 F.3d at 1268; Pastran v. K-Mart Corp., 210 F.3d 1201, 1203 n.1 (10th Cir. 2000).  The Court does, however, consider statements attributed to third parties for other admissible purposes.  In particular, such statements may be considered for the limited purpose of showing their effect on the listener or the declarant's state of mind.  See Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993) (effect on the listener); Wright v. Southland Corp., 187 F.3d 1287, 1304 n.21 (11th Cir. 1999) (declarant's state of mind); Pastran, 210 F.3d at 1203 n.1 (similar).  They also may be considered as verbal acts or operative facts when legal consequences flow from the utterance

-11-

of the statements.  <u>See generally</u> <u>Echo Acceptance Corp. v. Household Retail Servs., Inc.</u>, 267 F.3d 1068, 1087 (10th Cir. 2001).

Apart from the limitations noted above, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the admissible evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all admissible evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  <u>See</u> <u>Hunt v. Cromartie</u>, 526 U.S. 541, 551-52 (1999).

### B.    <u>Plaintiff's ADA Claim</u>

A motion for summary judgment on a claim for failure to reasonably accommodate a person's disability under the ADA is evaluated under the familiar burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973). <u>See</u> <u>Smith v. Midland Brake, Inc.</u>, 180 F.3d 1154, 1178 (10th Cir. 1999) (en banc).  Under this framework, the burden first falls on the employee to establish a *prima facie* case that: (1) he is a disabled person as defined by the ADA;  (2) he is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired;  and (3) his employer discriminated against him because of his disability.  <u>See</u> <u>Mackenzie v. City and County of Denver</u>, 414 F.3d 1266, 1274 (10th Cir. 2005) (citing <u>Butler v. City of Prairie Vill.</u>, 172 F.3d 736, 748 (10th Cir.1999)).

When the employee's desired accommodation is reassignment to a vacant position, these elements of a *prima facie* case are modified to require an initial showing that:

(1) The employee is a disabled person within the meaning of the ADA and has made any resulting limitations from his or her disability known to the employer;

(2) The preferred option of accommodation within the employee's existing job cannot reasonably be accomplished;

(3) The employee requested the employer reasonably to accommodate his or her disability by reassignment to a vacant position, which the employee may identify at the outset or which the employee may request the employer identify through an interactive process, in which the employee in good faith was willing to, or did, cooperate;

(4) The employee was qualified, with or without reasonable accommodation, to perform one or more appropriate vacant jobs within the company that the employee must, at the time of the summary judgment proceeding, specifically identify and show were available within the company at or about the time the request for reassignment was made; and

(5) The employee suffered injury because the employer did not offer to reassign the employee to any appropriate vacant position.

Once the employee produces evidence sufficient to make a facial showing on his or her prima facie case, the burden of production shifts to the employer to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer. See §42 U.S.C. 12113; 29 C.F.R. § 1630.15. If the employer does either of the above, summary judgment will be appropriate for the employer unless the employee then presents evidence establishing a genuine dispute regarding the affirmative defenses and/or rehabilitating any challenged elements of his or her prima facie case sufficiently to establish at least a genuine dispute of material fact as to such challenged elements.

Smith, 180 F.3d at 1179.

-13-

In this case, Plaintiff has made an initial showing that he is a disabled person as defined by the ADA for purposes of establishing his *prima facie* case.  "The statute defines disability as either (1) a physical or mental impairment that substantially limits one or more of an individual's major life activities, 42 U.S.C. § 12102(2)(A);  (2) a record of such an impairment, 42 U.S.C. § 12102(2)(B); or (3) being regarded as having such an impairment, 42 U.S.C. § 12102(2)(C)."  Mackenzie, 414 F.3d at 1275.  To determine whether Plaintiff meets the requirements of 42 U.S.C. § 12102(2)(A), the Court is to:  (1) consider whether Plaintiff's loss of his left arm above the elbow is a physical impairment, (2) identify the life activity upon which he relies and determine whether it constitutes a major life activity under the ADA, and (3) ask whether the impairment substantially limited the major life activity.  See Bragdon v. Abbott, 524 U.S. 624, 631 (1998).  "[W]hether a claimed affliction constitutes an impairment under the ADA and whether the identified endeavor constitutes a major life activity are determinations of law for the court to decide."  Poindexter v. Atchison, Topeka & Santa Fe Ry. Co., 168 F.3d 1228, 1230 (10th Cir.1999).

The evidence of record in this case supports a reasonable inference that Plaintiff's loss of his left arm is a physical impairment that imposes substantial limits on one or more major life activities.  While the regulatory definition of a disability can become quite technical,  see generally 29 C.F.R. § 1630.2(h)(1), (i), (j) (defining the phrases "physical or mental impairment," "major life activity," and "substantially limits"), the Tenth Circuit has noted that expert medical testimony is not always necessary to prove the existence of a physical impairment, see Mackenzie, 414 F.3d at 1275.  And the First Circuit has reasoned that "a

-14-

missing arm" is an example of a physical impairment that would be "obvious to a lay jury." Katz v. City Metal Co., 87 F.3d 26, 32 (1st Cir. 1996). Viewing the evidence of record in the light most favorable to Plaintiff, I have no difficulty making the inference that this type of impairment substantially limits a major life activity.

Under the framework outlined above, the fact that an employee is disabled and requests an accommodation does not automatically entitle him to be reassigned to a different position within the organization in accordance with his request. Rather, the focal point of the Court's analysis is on whether the requested accommodation is reasonable, see Smith, 180 F.3d at 1171, and this focus "does not shield a reassignment claim from summary judgment any more than does the reasonableness standard shelter other courses of action from a traditional summary judgment inquiry." Id. at 1180 (citing Meyer v. Conlon, 162 F.3d 1264, 1273-74 (10th Cir. 1998), and Hollingsworth v. Hill, 110 F.3d 733, 740-42 (10th Cir. 1997)).

The Tenth Circuit has set forth a number of limiting factors to be considered in determining whether a requested accommodation is reasonable. First, "the preferred option is always an accommodation that keeps the employee in his or her existing job if that can reasonably be accomplished." Id. at 1170. Second, the selected accommodation ordinarily must result from an "interactive process" in which both parties participate and communicate with one another in good faith. Id. at 1171-74. Third, the options for reassignment are limited to vacant, existing positions within the organization that do not require a promotion or a redefinition of essential job requirements; employers are not required to establish a new

position or remove another employee from an existing position in order to create a vacancy for a disabled employee. Id. at 1174-75, 1178. Fourth, employers also may limit the options for reassignment to those which do not violate other legitimate, nondiscriminatory employment policies that are firmly established within the organization, such as recognizing the seniority rights of a certain employees who are eligible to fill a vacant position. See id. at 1175-76; US Airways, Inc. v. Barnett, 535 U.S. 391, 403-05 (2002). Finally, it is up to the employer, not the employee, to choose which reassignment is offered to a disabled employee requesting an accommodation so long as the employer's offer is consistent with the above requirements. Smith, 180 F.3d at 1177-78.

The employer also has the option of raising the affirmative defense of "undue hardship." Id. at 1178. Even without this affirmative defense, consideration of the factors listed above may result in summary judgment "where, for example, the record is clear that the employee failed to take the necessary steps to initiate or participate in the interactive process," or "where reassignment would be unreasonable as a matter of law." Id. at 1180.

In this case, Plaintiff's request for reassignment to the position of dispatcher in the County Sheriff's office arose in the context of a prolonged and indefinite absence from work beginning on or about October 9, 2003. Examining Plaintiff's request for accommodation in proper context is significant because, as noted above, the employer's reassignment obligation extends only to positions which are currently vacant or which "the employer reasonably anticipates will become vacant in the immediate future." Id. at 1175 (citing Monette v. Electronic Data Systems Corp., 90 F.3d 1173, 1187 (6th Cir. 1996)).

This limitation stems from the fact that the ADA's "reasonable accommodation" provisions are written in the present tense, not the future tense.  See 42 U.S.C. § 12111(8); 45 C.F.R. § 1232(i).  These provisions

> "contain no reference to a person's future ability to perform the essential functions of his [or her] position.  To the contrary, they are formulated entirely in the present tense, framing the precise issue as to whether an individual "can" (not "will be able to") perform the job with reasonable accommodations.  Nothing in the text of the reasonable accommodation provision requires an employer to wait for an indefinite period for an accommodation to achieve its intended effect.  Rather, reasonable accommodation is by its terms most logically construed as that which, presently, or in the immediate future, enables the employee to perform the essential functions of the job in question."

Duckett v. Dunlop Tire Corp., 120 F.3d 1222, 1226 (11th  Cir.1997) (per curiam) (quoting Myers v. Hose, 50 F.3d 278, 283 (4th Cir. 1995)); accord Hudson v. MCI Telecomm. Corp., 87 F.3d 1167, 1169 (10th Cir. 1996).

Recognizing that the focus of the ADA's "reasonable accommodation" provisions is on the present rather than the future, courts have declined to construe these provisions as requiring employers to accommodate indefinite, prolonged, or unexplained absences from work, even when the employer acknowledges that such absences relate to a disability.  See, e.g., Monette, 90 F.3d at 1187-88.  Courts also have consistently recognized that "physical attendance in the workplace is itself an essential function of most jobs."  Mason v. Avaya Commc'ns, Inc., 357 F.3d 1114, 1119 (10th Cir. 2004) (collecting cases).  Thus, "even when an employee can satisfactorily perform the essential functions of her position, the employee 'must be willing to demonstrate these skills by coming to work on a regular basis.'" because

"'a regular and reliable level of attendance is a necessary element of most jobs.'" Id. at 1120 (quoting Tyndall v. Nat'l Educ. Centers Inc., 31 F.3d 209, 213 (4th Cir.1994)).  When an employee's absence from work is indefinite or unexplained, "[t]he employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation," nor is the employer required to "wait indefinitely for an employee's medical condition to be corrected."  Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1046-47 (6th Cir. 1998); see Taylor v. Pepsi-Cola Co., 196 F.3d 1106, 1110 (10th Cir. 1999) (collecting cases).

On the other hand, even a prolonged absence from work for purposes of medical care or treatment may constitute a reasonable accommodation under the ADA when it is for a definite period that falls within the parameters of an employer's established leave policies and procedures, and the employee provides a satisfactory explanation of the reasons for taking such an extended leave.  See, e.g., Rascon v. U S West Commc'ns, Inc., 143 F.3d 1324, 1334 (10th Cir. 1998).  In addition, FMLA generally allows an employee up to twelve weeks of leave for a serious medical condition if the employee follows the proper procedures for requesting such leave at the time of his departure, and the company for which he works falls under the statutory definition of an "employer."  See Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 959, 967 (10th Cir. 2002).

In the present case, unlike the facts in Smith, Defendant granted Plaintiff more than 12 weeks of FMLA leave.  And unlike the facts in Rascon, Plaintiff has not shown that he provided Defendant with the type of medical documentation at issue in that case.  Rather,

the evidence of record in this case is more akin to <u>Templeton v. Neodata Servs., Inc.</u>, 162 F.3d 617, 619 (10th Cir. 1998), where "the employee's failure to provide medical information necessary to the interactive process precludes her from claiming that the employer violated the ADA by failing to provide reasonable accommodation." Absent such information, "[t]he employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." <u>Gantt</u>, 143 F.3d at 1046-47.

The central question presented here is: What accommodation is reasonable when the employee has exhausted the medical leave available under FMLA and still has not provided the employer with any medical documentation or other means of obtaining a medical opinion from the employee's health-care provider with respect to when the employee is expected to be ready to return to work or what types of work the employee is likely to be able to perform? In this situation, Plaintiff would have the employer conclude that it is obvious the employee cannot perform his current job as an Adult Detention Officer and that any vacancies which arise in the County Sheriff's office for the position of dispatcher should be kept open and available for the employee to fill because the employee expressed an interest in occupying such a position if and when he is ready to return to work at some indefinite time in the future.

I conclude that such an accommodation is not reasonable as a matter of law in this context. In the county at issue here, the dispatcher is an employee of the County Sheriff, not the Board of County Commissioners. This distinction is significant because, under New

Mexico law, the County Sheriff is an elected official separate from the Board of County Commissioners.  See N.M. Const. art. X, § 5; N.M. Stat. Ann. § 41-4-5 (Michie 1994). While there is not a separation of powers between these elected officials at the constitutional level, the New Mexico Legislature has established a division of authority between them pursuant to statute.  See Bd. of County Comm'rs v. Padilla, 111 N.M. 278, 283-84, 804 P.2d 1097, 1101-02 (Ct. App. 1990). Under this statutory division of authority, the Board of County Commissioners retains the authority to establish merit systems or collective-bargaining agreements addressing such matters as salaries, leave policies, and procedural safeguards to be followed in demoting or discharging most county employees, including those employed by the County Sheriff.  See N.M. Stat. Ann. §§ 41-4-5, 41-4-6 (Michie 2004); Padilla, 111 N.M. at 284-85, 804 P.2d at 1102-03.  But other "elected county officials," including the County Sheriff, retain "'the authority to hire . . . persons employed by them to carry out the duties and responsibilities of the offices to which they are elected.'" Padilla, 111 N.M. at 285, 804 P.2d at 1103 (quoting N.M. Stat. Ann. § 4-38-19(A) (Michie 2004)); see generally Sanchez v. Bd. of County Comm'rs, 81 N.M. 644, 646-48, 471 P.2d 678, 680-82 (Ct. App. 1970) (distinguishing the duties of a board of county commissioners from the duties of a deputy sheriff).

By asking the Board of County Commissioners to require the County Sheriff to hire Plaintiff for a vacancy in the position of dispatcher in order to accommodate Plaintiff's disability, Plaintiff is essentially asking the Board of County Commissioners to usurp the County Sheriff's hiring authority in a manner contrary to the statutory scheme.  Such

usurpation of the County Sheriff's hiring authority is not a reasonable accommodation in this context.

To be sure, the statutory scheme would not be violated if the parties simply asked the County Sheriff to give Plaintiff the same opportunity to apply for the dispatcher position as other applicants, according to the procedural safeguards set forth in a county-wide merit system or county personnel policy.  See Padilla, 111 N.M. at 284-85, 804 P.2d at 1102-03. But in interpreting the ADA's "reasonable accommodation" provisions, "[n]umerous courts have assumed that the reassignment obligation means something more than treating a disabled employee like any other job applicant." Smith, 180 F.3d at 1170 (collecting cases). The substantive obligation at issue here is to *actually hire* the disabled employee for the requested position regardless of the qualifications of other potential applicants, not just to *consider* his application according to a common set of procedural safeguards.  See id.  And Plaintiff has not shown that such consideration would have made a difference in this instance, because the evidence of record is silent as to how his qualifications compared to those of other applicants.

Moreover, Plaintiff has not shown that the statute by which the Legislature firmly established the County Sheriff's hiring authority in this context is amenable to the kind of special exceptions that might apply to a private employer's internal hiring policies under the framework established in US Airways, Inc., 535 U.S. at 405-06.  The position of dispatcher for the County Sheriff's office involves tasks such as answering 911 calls and communicating emergencies to sheriff's deputies while they are on duty.  These are not the

type of tasks which can be postponed or left for another day, and thus a dispatcher position is not the type of job which an employer can reasonably be expected to leave vacant or short-staffed for an indefinite period while awaiting an absent employee's decision or a doctor's instructions about whether or when the employee is ready to begin working again. Leaving such a vacancy open in this manner places an undue hardship on the employer and the other employees who must carry out their jobs while the position is left unfilled.

Combined with Plaintiff's failure to provide medical documentation or a timetable for returning to work, his request to be reassigned to a position under the hiring authority of the County Sheriff placed Defendant in an untenable dilemma rather than offering an avenue for reasonable accommodation. On the one hand, Defendant could not send Plaintiff back to his job as an Adult Detention Officer because Plaintiff acknowledges that he does not want to return to the detention center and never provided the medical documentation necessary to determine whether he could perform that job (or whether it was possible to restructure that job so as to accommodate Plaintiff's disability). On the other hand, Defendant could not reassign Plaintiff to the position of dispatcher because, even assuming Plaintiff would be qualified to perform that job (with or without reasonable accommodation), Defendant could not override the statutory hiring authority of the County Sheriff, and the County Sheriff could not reasonably be expected to leave vacancies open indefinitely while awaiting further information from Plaintiff about when he could begin work or what accommodations he would need.

For these reasons, I conclude that Plaintiff has not met his burden of coming forward with evidence to show that he was qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired under the framework articulated in Smith, 180 F.3d at 1179-80.  Even if the evidence could be construed so liberally as to meet each element of Plaintiff's *prima facie* case, I also conclude in the alternative that Defendant has met its burden of conclusively rebutting one or more of these elements, and Plaintiff has failed to rehabilitate the challenged elements.  See id.

The evidence of record does not contain the indicators necessary to support a reasonable inference that Defendant's repeated requests for medical documentation were merely a pretext for avoiding the interactive process aimed at achieving a reasonable accommodation for Plaintiff's disability in this instance. Cf. Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir.1997) (listing factors which may suggest that an employer's proffered justification is   pretextual); Caze v. Keenan & Assoc., No. Civ. 04-1189 MCA/RHS (unpublished memorandum opinion and order filed October 27, 2005) (similar).  For example, the record does not indicate that Defendant had a practice of imposing unduly burdensome requests for medical documentation or other obstacles to employment on its other employees with physical impairments.  On the contrary, there is evidence of at least two employees with significant physical impairments (blindness in one eye and a paralyzed arm) who apparently worked for Defendant without incident in the past.

The evidence of record also shows that Defendant followed its normal policies with respect to FMLA leave, leave donation, pre-termination procedure, and the like when

responding to Plaintiff's situation.  While I recognize that it is possible to comply with other laws such as FMLA and still violate the ADA, in this instance it is beyond dispute that Defendant initially offered a reasonable accommodation for Plaintiff's disability by allowing him to take an extended period of leave from the date of his medical emergency on or about October 9, 2003, until his employment was terminated at the beginning of February 2004.

Plaintiff claims he viewed Defendant's requests for medical documentation during this period as being narrowly focused on when he could return to his previous work as a detention officer, without any accommodation.  Even when all reasonable inferences are drawn in Plaintiff's favor, however, the undisputed facts and objective evidence in the record do not support this narrow view.  The letters from Defendant to Plaintiff containing requests for medical documentation are phrased in general language referring to "work" in any capacity, and they were supplemented with clarifying questions at the pre-termination hearing.  Plaintiff was given repeated opportunities both orally and in writing to respond to such requests, and he never did.  Accordingly, Defendant is entitled to summary judgment on Plaintiff's ADA claim.

This conclusion, of course, does not in any way preclude Plaintiff from adding his name to the pool of applicants for the job of dispatcher, or any other job with the County or its elected officials.  In this regard, I note that Defendant's decision to terminate Plaintiff's previous employment was for non-disciplinary reasons, and the termination letter states that "we look forward to possibly working with you again in future."  [Ex. O to Doc. 30.]

## C.   **Plaintiff's State Law Claims**

Defendant also moves for summary judgment on the remaining claims asserted in Plaintiff's *Complaint*, which allege a violation of the NMHRA, breach of contract, and breach of an implied covenant of good faith and fair dealing.  Because these remaining claims arise under state law, and there is no allegation or evidence that the parties' citizenship is diverse, such claims are before this Court only by virtue of the supplemental jurisdiction conferred by 28 U.S.C. § 1367(a).  "The district courts may decline to exercise supplemental jurisdiction over a claim under [28 U.S.C. § 1367](a) if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).

Having granted summary judgment Plaintiff's ADA claim, which is the only claim in Plaintiff's *Complaint* that arises under federal law, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims.  See 28 U.S.C. § 1367(c)(3); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966).  In so declining, the Court has considered whether the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction.  See Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 541 (10th Cir. 1995).  The Court is not convinced that these factors weigh in favor of retaining jurisdiction.  The employment policies which are the subject of Plaintiff's remaining claims in this case are creatures of state and local law best suited to adjudication in a state court.  Notions of comity and federalism demand that a state court try such claims in the first instance, absent compelling reasons to the contrary.  See Thatcher Enters. v. Cache County Corp., 902 F.2d 1472, 1478

(10th Cir. 1990).  In addition, the Court's decision not to exercise supplemental jurisdiction is not necessarily fatal to Plaintiff's state-law claims, as 28 U.S.C. § 1367(d) may provide for the tolling of any limitations period regarding these claims.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court concludes that Defendant is entitled to summary judgment on the ADA claim alleged in Count I of Plaintiff's *Complaint*, and therefore Plaintiff's ADA claim must be dismissed with prejudice.  As all of Plaintiff's other claims arise under state law, they are dismissed without prejudice for lack of jurisdiction.

**IT IS, THEREFORE, ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 29] is **GRANTED**.

**IT IS FURTHER ORDERED** that the ADA claim asserted in Count I of Plaintiff's *Complaint* is **DISMISSED WITH PREJUDICE**

**IT IS FURTHER ORDERED** that the state-law claims asserted in Counts II through IV of Plaintiff's *Complaint* are **DISMISSED WITHOUT PREJUDICE** for lack of jurisdiction.

**IT IS FURTHER ORDERED** that the **PRETRIAL CONFERENCE** set for TUESDAY, May 2, 2006, at 9:00 a.m., the **CALL OF THE CALENDAR** set for THURSDAY, July 6, 2006, at 9:00 a.m., and the **JURY SELECTION/TRIAL** set for TUESDAY, July 11, 2006, at 9:00 a.m. are hereby **VACATED**.

**SO ORDERED** this 28th day of April, 2006, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge